**UNITED STATES of America, Plaintiff,**

v.

**Joshua Brent GRAY and Terrence A. Askew, Defendant.**

**No. CRIM.A. 3:03–00182.**

United States District Court, S.D. West Virginia, Huntington Division.

March 17, 2005.

---

R. Gregory McVey, Assistant United States Attorney, Charleston, WV, for Plaintiff.

George H. Lancaster, Jr., Federal Public Defender, Mark French, Giatras & Webb, Charleston, WV, for Defendant.

Joshua Brent Gray, Huntington, WV, pro se.

## ORDER

GOODWIN, District Judge.

Since 1987, district court judges have determined criminal sentences pursuant to the Sentencing Reform Act of 1984 (SRA), Pub.L. 98–473, Title II, §§ 211–238, 98 Stat. 1987 (1984) and the Guidelines issued by the United States Sentencing Commission. The Supreme Court's recent decision in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), significantly alters the sentencing scheme that has existed since 1987. In accordance with the *Booker* decision, I conducted the sentencing hearing in the instant case as follows.

First, I calculated the applicable Guideline range for each defendant by making appropriate findings of fact and resolving objections to the presentence report. Following this determination, I examined and applied the sentencing factors set forth in 18 U.S.C. § 3553(a). *See United States v. Hughes,* 401 F.3d 540 (4th Cir.2005) ("Consistent with the remedial scheme set forth in *Booker,* a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."). I then considered what the Guideline advice would have been if calculated using only the evidence proven beyond a reasonable doubt. Once I had investigated each applicable factor, I considered these factors, along with the Guideline range, as separate pieces of advice that together informed the exercise of my discretion as I determined an appropriate sentence for the defendants, Terrence Askew and Joshua Gray.

Below is a discussion of the factual findings determined at the sentencing hearing, a discussion of the applicable § 3553(a) factors, and a calculation of the defendants' advisory Guideline range. In addition to factual objections to the presentence report, each defendant, by counsel, filed numerous legal arguments with the court in the form of sentencing memoranda. Specifically, the defendants raised important reasonable doubt, *ex post facto,* and *Crawford v. Washington* concerns both in their memoranda to the court and at the hearing in this matter. I deal with each of these concerns at length below.

## I. Background

The facts, which were fully developed at the evidentiary hearing, can be summarized as follows. On July 3, 2003, Joshua Gray and Terrence Askew were arrested following a "knock and talk" and subsequent search of Mr. Gray's residence. During the search, officers found a firearm, ammunition, cocaine base, and $8,680.00 representing the proceeds of the defendants' drug trafficking. On March 12, 2004, Mr. Askew plead guilty, pursuant to a written plea agreement, to count two of an indictment charging him with violating 21 U.S.C. § 841(a)(1) and 18 U.S.C.

§ 2, aiding and abetting the possession with intent to distribute cocaine base. On March 15, 2004, Mr. Gray was scheduled to appear before this court to enter his plea of guilty. The defendant, however, failed to appear and a bench warrant was issued for his arrest. On March 18, 2004, Mr. Gray was arrested. On April 9, 2004, he plead guilty, pursuant to a written plea agreement, to count one of the indictment. This count charged him with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846. Defendants Gray and Askew came before this court for sentencing on March 14, 2005. After hearing evidence and resolving the defendants objections, I calculated the drug amount attributable to the defendants and the advisory Guideline range as follows.

First, after hearing the testimony David Cole, the objections of the defendants, and after the government conceded that the readily provable amount of cocaine base was 47.26 grams, I found that the government had not proven by a preponderance of the evidence the additional 59 grams of relevant conduct that was described in the presentence report and developed from historical evidence. After hearing all of the evidence, I found that the remaining 47.26 grams of cocaine base were properly attributed to both defendants and found that the government had proven this amount by both a preponderance of the evidence and beyond a reasonable doubt. I further found that the government had proven, both by a preponderance of the evidence and beyond a reasonable doubt, that both defendants possessed a firearm in connection with their offense within the meaning of section 2D1.1(b)(1) of the Sentencing Guidelines.

Thus, I found both Mr. Askew and Mr. Gray's base offense level to be 30. Section 2D1.1(a)(3) and the Drug Quantity Table of the Sentencing Guidelines call for a base offense level of 30 if the amount of cocaine base is at least 35 grams but less than 50 grams-in this case, the amount of cocaine base was 47.26 grams. To this base offense level, I added a two-level increase to reflect the presence of a firearm, as provided by section 2D1.1(b)(1) of the Guidelines, which increased each defendants' offense level to 32. I then decreased Mr. Askew's offense level by three levels to reflect the adjustment he earned for his acceptance of responsibility. Accordingly, I found Mr. Askew's total offense level to be 29. I declined to apply the acceptance of responsibility reduction to Mr. Gray and also found that he did not qualify for a mitigating role reduction. Accordingly, I found Mr. Gray's total offense level to be 32. Both defendants have two criminal history points, which establish a history category of "II." Given a total offense level of 29 and a criminal history category of II, I found Mr. Askew's advisory Guideline range to be 97–121 months of incarceration, followed by a 3 year term of supervised release. I found Mr. Gray's advisory range, calculated with the same criminal history, to be 135–168 months. After considering the applicable sentencing factors, the defendants' legal objections, and what the advisory range would be if calculated beyond a reasonable doubt, I sentenced both Mr. Gray and Mr. Askew to 97 months of incarceration, followed by 3 years of supervised release.

## II. Sentencing Factors found in 18 U.S.C. 3553(a)

Section 3553(a) of Title 18 of the United States Code instructs sentencing judges to "impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing." This section further instructs that courts, in determining the particular sentence to be imposed, should consider the several factors listed in § 3553(a).

## A.  Terrence Askew

In determining a sentence that achieved the purposes set forth in 18 U.S.C. § 3553(a), I first considered the nature and circumstances of Mr. Askew's offense. The testimony and evidence developed at the sentencing hearing indicates that Mr. Askew sold a significant quantity of cocaine base during his and Mr. Gray's association. Although no evidence of specific violence was presented at trial, I found that Mr. Askew possessed a firearm in conjunction with his drug trafficking.

At the hearing, I also considered Mr. Askew's history and characteristics. Mr. Askew is twenty five years old, single, and has never been married. He is the father of three children between the ages of one and five. His children all reside with their mother in Detroit, Michigan. Mr. Askew has yet to see his youngest daughter, but prior to his arrest in the instant case, he was providing his family with some financial support. Mr. Askew completed nine years of formal education and obtained a G.E.D. in 1998. Mr. Askew is a young man with children to support, and he has indicated a willingness to work to do so. He has a relatively low criminal history and has accepted responsibility for his actions in the instant case.

Mr. Askew has a history of substance abuse, but he has not received any counseling as an adult. At the sentencing hearing, I recommended that Mr. Askew be incarcerated in a prison facility that could offer him intensive drug treatment. Such treatment will provide Mr. Askew with necessary rehabilitation. At the sentencing, Mr. Askew, by counsel, indicated a willingness to further his education. Thus, I also recommended that to the extent that he wishes to participate, any and all educational or job training opportunities should be made available to Mr. Askew in prison.

Thus, I found that a term of 97 months incarceration, followed by a 3 year term of supervised release satisfied the sentencing factors found in 18 U.S.C. § 3553(a). Specifically, I found that this sentence, which is within the advisory Guideline range, reflects the history and characteristics of Mr. Askew and the nature, circumstances, and seriousness of the offense.

## B.  Joshua Gray

The nature and circumstances of Mr. Gray's offense are very similar to those described above for Mr. Askew. Specifically, Mr. Gray was also involved in the trafficking of a significant amount of cocaine base and made his residence available for that purpose. Additionally, the evidence indicated that a firearm was present and was apparently used for protection during the commission of the instant offense.

I also considered Mr. Gray's history and characteristics when crafting the appropriate sentence. Mr. Gray is thirty years old and single. He graduated from high school, attended classes at Marshall University, and completed an electrical worker apprenticeship program. Despite these accomplishments, Mr. Gray is a serious drug addict. His relatively low criminal history consists almost entirely of drug-related offenses. Furthermore, Mr. Gray has admitted using marijuana, cocaine, and cocaine base since the age of 19. Additionally, he has admitted to significant abuse of heroin and opiates since the age of 21. Mr. Gray has participated in several treatment programs, including drug counseling sessions provided by the Probation Office at the Prestera Center for Mental Health while released on federal bond in this matter.

In addition, while released on bond, Mr. Gray worked as an apprentice electrician from August 2003 through February 2004.

The president of Pritchard Electric wrote me a letter attesting to Mr. Gray's ability to follow direction his participation as a "team player," and his overall work ethic. The letter indicates that Mr. Gray worked as many overtime hours as the company needed and was an asset to both his employer and the local union. While I commended Mr. Gray for his hard work, I noted that during this time, he also removed his electronic monitoring bracelet and attempted to flee the area while released on bond. When Mr. Gray failed to appear for his guilty plea hearing on March 15, 2004, I issued a bench warrant for his arrest and he was re-detained. With the exception of the methadone maintenance program in which Mr. Gray enrolled following his arrest in the instant case, he has never participated in any significant long-term substance abuse program. Thus, at the sentencing hearing, I recommended that Mr. Gray be incarcerated in a prison facility that could provide him with an intensive drug treatment program. This will provide Mr. Gray with the necessary rehabilitation.

In this particular case, I found that a sentence below the advisory Guideline range was necessary in order to avoid sentencing disparities in this case. Namely, Mr. Gray is exposed to a greater sentence under the Guideline range than Mr. Askew, yet I find their level of criminal conduct to be roughly equal. Mr. Gray and Mr. Askew were jointly trafficking cocaine base from Mr. Gray's residence and have the same criminal history category. Although Mr. Gray did not earn the reduction for acceptance of responsibility that Mr. Askew did, I find that a term of 97 months of incarceration, followed by a 3 year term of supervised release, is still warranted for Mr. Gray. All evidence and testimony developed in the presentence report and at the hearing indicate that Mr. Gray was not profiting from the drugs, was not securing the drug amounts, and was not directly handling the firearm. Accordingly, although Mr. Gray is still a culpable member of the conspiracy to distribute cocaine base, I find that the sentence imposed is appropriate and reasonable in light of Mr. Gray's history and characteristics and the nature, circumstances, and seriousness of the offense.

### III. Reasonable Doubt

■ In their sentencing memoranda, the defendants argued that reasonable doubt is the correct burden of proof to apply to factual determinations at sentencing. My reading of *Booker*, however, suggests that the advisory Guideline determinations must still be made by a preponderance of the evidence. Specifically, the remedial majority opinion states that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S.Ct. at 767. This directive makes no mention of a changed standard of proof. Accordingly, the natural inference appears to be that district courts must calculate the advisory Guideline range using the same burden of proof that was used under the mandatory regime. Under the mandatory regime, district courts were instructed to make factual findings at sentencing by a preponderance of the evidence. *See, e.g., United States v. Watts*, 519 U.S. 148, 156, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) ("The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, U.S.S.G. § 6A1.3, comment, and we have held that application of the preponderance standard at sentencing generally satisfies due process." (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91–92, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986))). While determining the advisory Guideline range, I will therefore continue to make factual findings by a preponderance of the evi-

dence, as I did during the sentencing hearing in this case. As I explain below, however, the reasonable-doubt standard does retain some usefulness in the new advisory system.

Because *Booker* rendered the Guidelines advisory, part of my sentencing determination turned on how much faith I placed in the Guideline advice. As Justice Stevens noted in his dissent in *Booker*: "[J]udges must still *consider* the sentencing range contained in the Guidelines, but that range is now nothing more than a suggestion that may or may not be persuasive to a judge when weighed against the numerous other considerations listed in 18 U.S.C.A. § 3553(a).... How will a judge go about determining how much deference to give to the applicable Guidelines range?" *Booker*, 125 S.Ct. at 787–88 (Stevens, J., dissenting in part). In general, I will continue to place great weight in the recommendation offered by the Guidelines, as such advice is the product of almost two decades of expert analysis and consideration. Nevertheless, the Guidelines are now advice rather than instruction. One of the fundamental problems with advice is determining how much confidence to place in it. The reliability of the advice helps inform that determination, and reliability is best quantified through an appropriate standard of proof. Specifically, the reasonable-doubt standard offers a useful method for measuring the degree of certainty that I have in the factual determinations underpinning the advisory Guideline range.

The burden of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Traditionally, criminal convictions have rested on a finding of proof beyond a reasonable doubt. This "requirement that guilt of a criminal charge be established beyond a reasonable doubt dates at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In a civil action that only involves monetary damages, "we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor," and accordingly it "seems peculiarly appropriate" to apply a preponderance standard. *Id.* at 371–72 (Harlan, J., concurring). In criminal matters, however, "we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty," and we believe in general that "it is far worse to convict an innocent man than to let a guilty man go free." *Id.* at 372, 90 S.Ct. 1068 (Harlan, J., concurring). The American people have always maintained a healthy degree of wariness towards the coercive force of the government, especially when fundamental individual rights are at stake. *Id.* at 363, 90 S.Ct. 1068 ("The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction."). Clearly, it is a long-standing and deeply cherished tradition of this nation to bar the state from depriving a person of their liberty without certainty of guilt. This desired certainty has long been quantified as proof beyond a reasonable doubt.

Granted, these liberty concerns are presented much more forcefully at trial than at sentencing. At trial, the defendant is presumed innocent, his liberty has not been curtailed, and his reputation is free from stigma. Once a defendant is convicted, however, stigma attaches and his liberty is forfeited. This change in circumstances is the primary reason that

the Supreme Court has held that the preponderance of the evidence standard satisfies the minimal requirements of due process at the sentencing phase. In fact, "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." *McMillan*, 477 U.S. at 91, 106 S.Ct. 2411. The relaxation of procedural protections at sentencing stems from the recognition that "criminal sentencing takes place only after a defendant has been adjudged guilty beyond a reasonable doubt. Once the reasonable-doubt standard has been applied to obtain a valid conviction, 'the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him.'" *Id.* at 92 n. 8, 106 S.Ct. 2411 (quoting *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)). In effect, a convicted defendant has forfeited his liberty to the maximum extent allowed by law, and the government may incarcerate the defendant for any period of time within that statutory range.[1]

In *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), the Court addressed the question of whether a judge could consider conduct of which the defendant had been acquitted at trial for purposes of making sentencing determinations by a preponderance of the evidence under the mandatory Guideline regime. Watts was acquitted at trial of using a firearm in relation to a drug offense, but the district court "found by a preponderance of the evidence that Watts had possessed the guns in connection with the

drug offense" and added two points to Watts' offense level during the Guideline calculations. *Id.* at 150, 117 S.Ct. 633. The Ninth Circuit ruled otherwise, "holding that 'a sentencing judge may not, under *any* standard of proof', rely on facts of which the defendant was acquitted." *Id.* The Supreme Court reversed, and held that even "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157, 117 S.Ct. 633. Thus, the Court effectively endorsed the preponderance standard at sentencing under the mandatory Guideline regime. *Id.* at 156, 117 S.Ct. 633.

Notably, however, the *Booker* decision indicated some dissatisfaction with this approach. The reasoning in *Watts*, for example, was drawn into serious question by the constitutional majority in *Booker*: "*Watts*, in particular, presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument. It is unsurprising that we failed to consider fully the issues presented to us in these cases." *Booker*, 125 S.Ct. at 754 n. 4. Similarly, Justice Thomas' dissent called into question the assumption in the comments to the Guidelines that the preponderance standard satisfied concerns of due process:

The commentary to § 6A1.3 states that "[t]he Commission believes that use of a

---

1. At least one commentator has described this approach as a "positivist" theory of liberty. *See, e.g.,* Susan N. Herman, *Applying Apprendi to the Federal Sentencing Guidelines: You Say You Want a Revolution?*, 87 IOWA L. REV. 615, 638 (2002). Professor Herman states, "the Court [has] adopted the view that once a person has been convicted, that person has no 'liberty' interest for the maximum period of

time provided by the statute of conviction. From that definitional starting point, the Court has reasoned that if the state wishes to consider giving back some portion of that forfeited liberty, in the form of parole or a lesser sentence, that decision is a matter of grace, and does not necessitate procedural rights." *Id.*

preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the Guidelines to the facts of a case." The Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

*Id.* at 798 n. 6 (Thomas, J., dissenting). Thus, Justice Stevens' and Thomas' footnotes in *Booker* seem to recognize the potential due process problems created by the application of the preponderance standard in the mandatory Guideline regime. This dissatisfaction, however, has apparently been relieved by the decision to render the Guidelines advisory and non-binding.

▉ Not only did this change remedy the Court's Sixth Amendment concerns, it seems to have alleviated the constitutional concerns regarding the appropriate burden of proof that existed under the mandatory system. A person who is found guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment allowed by statute, rather than the maximum allowed under the Guidelines, and it is therefore constitutional to sentence the guilty defendant anywhere within that range based on facts proven only by a preponderance of the evidence.[2] *See, e.g., Harris v. United States,* 536 U.S. 545, 558, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial,

and reasonable-doubt components of the Fifth and Sixth Amendments."). The Guidelines and the section 3553(a) factors now operate to advise the judge in determining an appropriate sentence within the statutory range, in contrast to the mandatory regime, in which the Guidelines themselves dictated the range.

This post-*Booker,* advisory Guideline regime is a completely new universe for federal sentencing courts. It is not a return to the pre-Guidelines era of unfettered discretion, yet it is less restrictive than the mandatory Guideline system. It accordingly falls somewhere along the continuum between indeterminate and determinate sentencing, because district courts must calculate and consider the Guidelines, yet are not bound by them. One of the most important questions I face in the new advisory regime is how much confidence to place in the advice of the Guidelines. *Booker,* 125 S.Ct. at 787–88 ("How will a judge go about determining how much deference to give to the applicable Guidelines range?") (Stevens, J., dissenting in part). It is the responsibility of district courts to develop principled methods for addressing this question and determining how much weight to put in the advisory Guideline range, especially in light of the 3553(a) factors that we must also consider. The reasonable-doubt standard, as a measurement of reliability, seems especially well-suited to the task of determining how much faith I should place in the Guideline advice.

The burden of proof represents a substantive embodiment of social values regarding the risk of error. Furthermore, "standards of proof are important for their symbolic meaning as well as for their prac-

---

**2.** According to the remedial majority opinion in *Booker,* sentences imposed under the advisory Guideline regime must be reviewed by appellate courts for "reasonableness." 125

S.Ct. at 765–67. The extent to which this standard of review will operate to constrain the discretion of the sentencing judge remains to be determined.

tical effect." *Addington,* 441 U.S. at 426, 99 S.Ct. 1804; *see also In re Winship,* 397 U.S. at 370, 90 S.Ct. 1068 ("Although the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.") (Harlan, J., concurring). The reasonable-doubt standard in particular serves as a reminder and a message that "[i]n the administration of criminal justice, our society imposes almost the entire risk of error upon itself." *Addington,* 441 U.S. at 423–24, 99 S.Ct. 1804. As a tool for reducing the risk of error, reasonable doubt retains its usefulness in the advisory regime. As Justice Harlan noted in his concurrence in *Winship,* the chosen standard of proof operates "to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Id.* at 370, 90 S.Ct. 1068 (Harlan, J., concurring).

The practical effect of factfinding at sentencing, even under the advisory regime, is most often to increase a defendant's period of incarceration based on findings that I make by a preponderance of the evidence. The risk of error is not insignificant or inconsequential. Even though the defendant is already theoretically exposed to the maximum prison term allowed by statute, an erroneous factual determination regarding relevant conduct at sentencing will likely result in a longer period of incarceration than if the determination were not made. It therefore seems important to consider the risk of error when calculating the advisory range of incarceration. The reasonable-doubt standard presents a useful tool for closing the margin of error in this context. In essence, it helps me to measure the degree of certainty that I have in the Guideline advice before I sentence a defendant to prison.

At each sentencing, I will continue to calculate the advisory Guideline range based on a preponderance of the evidence. This initial determination is required by the remedial *Booker* majority opinion, which dictates that the district courts must still calculate and consider the Guideline range, but does not change the applicable burden of proof. I have examined our sentencing jurisprudence for assistance in weighing the strength of the Guideline advice, and I have found that the reasonable-doubt standard offers a principled means of evaluating the credibility of the advisory Guideline range, reducing the risk of erroneous factual determinations, and informing the exercise of my discretion under the advisory Guideline regime. Accordingly, after I calculate and consider the advisory Guidelines for each defendant by a preponderance of the evidence in accordance with *Booker,* I will consider what the Guideline range would be if based solely on conduct that I have found beyond a reasonable doubt. While this additional consideration is no more binding on my determination than the advisory Guidelines themselves, it will help me to weigh the reliability of the advice provided by the Guidelines, and will inform the exercise of my discretion as I determine an appropriate sentence in light of the advisory Guideline range and the 3553(a) factors.

In many cases, the reasonable-doubt range will simply overlap exactly with the advisory Guideline range, and will give me enhanced confidence in sentencing determinations based on the Guideline advice. In other cases, however, there may be drastic differences between the two ranges. For example, envision a scenario in which the advisory Guideline range for a drug offense is 324–405 months. Further imagine, based solely on findings made by a reasonable doubt at the sentencing hearing, that the range would be only 100–125 months. This disparity only becomes ap-

parent when the reasonable-doubt standard is employed as an advisory tool.[3] While this disparity is not strictly determinative of the ultimate sentence, it certainly indicates a much larger risk of factual error underlying the advisory Guideline calculations. Recognition of this disparity therefore helps me to determine the appropriate degree of deference that I should give to the Guideline advice.

■ In the instant case, the reasonable-doubt range for each defendant overlaps exactly with their advisory Guideline ranges determined by a preponderance of the evidence. Specifically, I find that the government demonstrated at the sentencing hearing, by both a preponderance of the evidence and beyond a reasonable doubt, that 47.26 grams of cocaine base were properly attributed to both defendants. I also found that the government demonstrated, by both a preponderance of the evidence and beyond a reasonable doubt, that both defendants possessed a firearm in connection with the offense. Accordingly, this overlap enhanced my confidence in their advisory Guideline ranges. Thus, I found that the advice of the Guidelines was entitled to a high level of deference in each defendant's case.

## IV. *Crawford v. Washington*

■ In their sentencing memoranda, the defendants also argued for the application of another source of procedural protection: the Confrontation Clause. Specifically, the defendants argued that the Supreme Court's recent decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), should apply at their sentencing hearings. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which set the precedent in confrontation clause jurisprudence for nearly twenty-five years, blended the constitutional mandate with the rules of evidence. Pursuant to the holding of *Roberts,* out-of-court statements were admissible at trial only if: (1) the declarant was unavailable and (2) the statements were reliable because they fell within a firmly rooted hearsay exception or demonstrated particularized guarantees of trustworthiness. *Id.* at 66, 100 S.Ct. 2531. Following *Roberts,* the federal courts of appeal had consistently held that the aspect of the Confrontation Clause restricting hearsay did not apply at sentencing. *See United States v. Johnson,* 935 F.2d 47, 50 (4th Cir.1991); *United States v. Beaulieu,* 893 F.2d 1177, 1180–81 (10th Cir.1990); *United States v. Petty,* 982 F.2d 1365, 1367 (9th Cir.1993); *United States v. Wise,* 976 F.2d 393, 402 (8th Cir.1992) (en banc); *United States v. Silverman,* 976 F.2d 1502, 1510 (6th Cir.1992) (en banc); *United States v. Marshall,* 910 F.2d 1241, 1244 (5th Cir.1990); *United States v. Kikumura,* 918 F.2d 1084, 1102 (3d Cir. 1990); *United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992).

*Crawford v. Washington,* however, has breathed new life into the debate. The

---

**3.** This approach is in accord with principles expressed in the Supreme Court's sentencing jurisprudence. In *McMillan,* for example, the Court determined that visible possession of a firearm during a crime could be determined by a judge at sentencing based solely on the preponderance of the evidence standard. The Court noted, however, that "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." 477 U.S. at 88, 106 S.Ct. 2411. This tail-wagging-the-dog danger remains present under the advisory Guidelines. It is not uncommon for the Guidelines to recommend doubling, tripling or quadrupling a sentence based solely on relevant conduct found by a preponderance of the evidence.

*Crawford* Court reunited Confrontation Clause protection with the historical motivation for the clause, thereby shifting the focus away from the rules of evidence. As the Court noted, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 1363. Accordingly, the *Roberts* doctrine was replaced by an analysis that is more closely tied to the actual wording of the Confrontation Clause, *Id.* at 1364. The clause speaks of the right to confront witnesses against the defendant, and *Crawford* makes an important distinction between the treatment of testimonial and non-testimonial statements. *Id.* The Court in *Crawford* concluded, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374.

The Supreme Court, however, has never decided whether sentencings are "criminal prosecutions" for Sixth Amendment purposes. The *Crawford* Court's legal conclusions are premised upon facts set in the context of a trial, and they do not transfer neatly to the sentencing context. A convicted person at sentencing is not entitled to the same level of procedural protection as an innocent person at trial. Arguments that sentencings under the Guidelines closely simulate trials so as to require the same procedural protections have been significantly undermined by the *Booker* remedy that makes the Guidelines advisory. Under the advisory system, the factual findings that I make at sentencing no longer mandate a defendant's punishment with mathematical precision. In the absence of such mandatory, fact-driven penalty determinations, arguments for constitutional procedural protections at sentencing are weakened. Accordingly, I

cannot find that I am required to apply *Crawford* at sentencing.

For hotly contested issues, however, the truth-seeking function of the Confrontation Clause deserves attention at sentencing. In cases involving genuine disputes, my calculation of the advisory Guideline range requires that I must first consider the available evidence to resolve factual disputes and objections to the presentence report. The adversarial system provides the best method of establishing the reliability of testimonial evidence and the appropriate weight to assign to such evidence. Accordingly, I strongly encourage the use of witness testimony and cross-examination to resolve factual disputes at sentencing, notwithstanding my finding that *Crawford* does not apply at sentencing under the post-*Booker* sentencing regime.

## V. *Ex Post Facto*

The defendants in this case further argued, in their memoranda and at sentencing, that I may not apply the remedy outlined in *Booker* to the disadvantage of offenders whose criminal conduct predates the Supreme Court's decision. Although the defendants argue for the application of Justice Steven's constitutional holding, they argue that the retroactive application of Justice Breyer's remedial opinion in *Booker* violates the Due Process clause pursuant to the Supreme Court's holding in *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), *Rogers v. Tennessee*, 532 U.S. 451, 468, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), and the precedent established by a long line of *ex post facto* decisions. Because I find that the defendants had "fair warning" of the maximum punishment to which they exposed themselves as a result of their criminal conduct, I find that the due process concerns articulated in *Bouie*, *Marks*, and

*Rogers* do not apply to the present case. Accordingly, I find that the application of both portions of the *Booker* decision to the determination of the defendants' sentence does not violate the *ex post facto* prohibition.[4]

■ The *Ex Post Facto* clause of the Constitution provides that "no state shall ... pass any ... ex post facto law." U.S. Const. art. I, § 10, cl. 1. As this clause makes clear, it "is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of the government." *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Although the *Ex Post Facto* clause does not, of its own force, apply directly to judicial decisions, the Supreme Court has held that the prohibition against *ex post facto* laws is incorporated to a limited extent in the notion of due process. In *Bouie*, the Supreme Court held that judicial enlargement of a criminal statute, applied retroactively, violated the Due Process clause of the Fourteenth Amendment. The Court noted that "a deprivation of the right to fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.* at 352, 84 S.Ct. 1697. Thus, the Court determined that retroactive application of an unforeseeable judicial enlargement of a criminal statute operates "precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* at 353, 84 S.Ct. 1697. Accordingly, the *Bouie* Court concluded that if a "judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." *Id.* at 354, 84 S.Ct. 1697. Draw-

ing an analogy to cases in which the Court had held criminal statutes "void for vagueness," the Court noted that the Due Process clause has always stood for the "basic principle that a criminal statute must give fair warning of the conduct that makes it a crime." *Id.* at 350, 84 S.Ct. 1697. Thus, the court concluded that deprivation of the right to fair warning could result "both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Id.* at 352, 84 S.Ct. 1697.

The Court further extended their reasoning to the Due Process clause of the Fifth Amendment in *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). In *Marks,* the Court noted that the *Ex Post Facto* clause limits the powers of the Legislature, but "does not of its own force apply to the judicial branch of government." *Id.* at 191, 97 S.Ct. 990 (citing *Frank v. Mangum,* 237 U.S. 309, 344, 35 S.Ct. 582, 59 L.Ed. 969 (1915)). The Court noted, however, that the "principle on which the Clause is based-the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties-is fundamental to our concept of constitutional liberty." *Id.* at 191–92, 97 S.Ct. 990. As such, the Court held that the right to fair warning is protected by the Due Process clause of the Fifth Amendment.

In *Marks,* the petitioners were charged with transporting obscene materials in interstate commerce in violation of 18 U.S.C. § 1465. The conduct that gave rise to the charges occurred prior to a Supreme Court decision announcing new standards for "isolat[ing] 'hard core' pornography from expression protected by the First

---

4. I decline to reach the question of whether there would be *ex post facto* implications had this court sentenced the defendants to a term of imprisonment above their individual advisory Guideline ranges. That issue is not presented in this case.

Amendment." *Id.* at 190, 97 S.Ct. 990. The petitioners argued that they should not be subject to the new standards that were created after their conduct was complete. Instead, the petitioners argued that they were entitled to a jury instruction under the old standards defining obscene materials. The Court agreed, finding that the new standards, which were articulated in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), cast a significantly wider net than the prior standard, set forth in *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). Thus, the judicial decision in *Miller* expanded criminal liability by broadening the definition of obscene material to include material that would not have been defined as obscene under the older *Memoirs* standard. Because the defendants did not have "fair warning" that their conduct was criminal at the time of their offense, the Court held, in accordance with *Bouie,* "that the Due Process clause precludes the application to petitioners of the standards announced in *Miller v. California,* to the extent that those standards may impose criminal liability for conduct not punishable under *Memoirs." Id.* at 196, 97 S.Ct. 990. Thus, both *Bouie* and *Marks* were concerned with the *ex post facto* implications of judicial determinations that expanded the definition of substantive crimes to encompass conduct innocent when it occurred.

In *Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), the Court further clarified its holdings in *Bouie* and *Marks.* The *Rogers* Court first affirmed that "limitations on *ex post facto* judicial decisionmaking are inherent in the notions of due process." *Id.* at 456, 121 S.Ct. 1693. In *Rogers,* the petitioner argued that the Tennessee Supreme Court had erred in rejecting his claim that the *Ex Post Facto* clause, encompassed by the Due Process clause, prohibited the retroactive application of a judicial decision that abolished the year and a day rule for murders. The *Rogers* Court clarified, however, that "[t]o the extent petitioner argues that the Due Process clause incorporates the specific prohibitions of the *Ex Post Facto* clause as identified in *Calder,* petitioner misreads *Bouie." Id.* The Court went on to conclude that although "our opinion in *Bouie* does contain some expansive language ... [t]his language is dicta." *Id.* at 458–59, 121 S.Ct. 1693. Instead, the *Rogers* Court noted that its decision in *Bouie* was rooted firmly in "well-established notions of *due process." Id.* (emphasis in original).

Specifically, the *Rogers* Court noted that the due process rights outlined in *Bouie* "rested on core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.* at 459, 121 S.Ct. 1693. The *Rogers* Court denied that the opinion in *Bouie* went so far as to "incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions." *Id.* Instead, the *Rogers* Court found that the *Bouie* decision articulated a "more basic and general principle of fair warning." *Id.* The *Rogers* Court concluded by holding that a judicial alteration of a common law doctrine of criminal law could violate the principles of fair warning, and thus should not be given retroactive effect, only where it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Id.* at 462, 121 S.Ct. 1693. Finding that the abolition of the year and a day rule by the Tennessee Supreme Court was not unexpected and indefensible, the *Rogers* Court declined to find a due process violation in the retroactive application of the judicial decision. *Id.*

■ Thus, my application of the remedial holding in *Booker* presents *ex post facto* implications only if it violates the notion of "fair warning" embodied in the Due Process clause of the Fifth Amendment. The Eleventh Circuit recently dealt with an argument similar to the defendants' argument here, and determined that the notion of fair warning is not offended by the retroactive application of the Court's remedial decision in *Booker*. For the following reasons, I agree.

In *United States v. Duncan*, 400 F.3d 1297 (11th Cir.2005), the defendant urged the court to apply Justice Steven's constitutional majority decision to his case, but argued that the retroactive application of Justice Breyer's opinion violates the Due Process clause. Specifically, the defendant argued that Justice Breyer's remedial decision, if applied retroactively, would increase the sentence authorized by the jury's verdict to a maximum of life and would operate as an *ex post facto* law in violation of his due process rights. The Eleventh Circuit declined to adopt the defendant's argument, noting that at the time Duncan committed his offense, the United States Code informed Duncan that he could face life imprisonment upon a jury conviction. According to the court, "[t]he Guidelines at the time also informed Duncan that a judge would engage in fact-finding to determine his sentence and could impose up to a sentence of life imprisonment." *Id.* at 1307, citing 18 U.S.C. § 3551 et seq. Thus, the *Duncan* court concluded that the defendant "had ample warning at the time he committed his crime that life imprisonment was a potential consequence of his actions. Applying the principles announced in *Rogers*, [the defendant's] due process rights cannot be said to have been violated." *Id.* at 1307. The court further noted that at the time of the defendant's conduct, federal sentencing jurisprudence looked to the United States Code as establishing maximum sentences.

The court also noted that "although mandatory Guidelines were in place, the law of this Circuit then recognized the U.S.Code as the source of the maximum sentence .... As another Circuit has noted, 'In fact, before *Blakely* was decided, every federal court of appeals had held that *Apprendi* did not apply to Guideline calculations made within the statutory maximum.'" *Id.* at 1308 (citations omitted).

Thus, the defendants in the instant case had fair warning of the potential consequences of their conduct by virtue of the statutory maximums set by the United States Code. These code sections have long been referenced by the Sentencing Guidelines, judges, and presentence reports. Thus, the surprise that the defendants may have experienced when learning that the Guidelines were no longer a mandatory system is not analogous to the surprise experienced by the defendants in *Bouie* and *Marks*, who learned that their conduct, innocent when it was done, had become a crime after the fact. Accordingly, I found that the applicable United States Code provisions provided the defendants in this case with the requisite fair warning that their conduct was a crime punishable by up to 20 years imprisonment.

## VI. Conclusion

After considering the advisory guideline range, the applicable sentencing factors, the defendants' legal objections, and what the advisory range would be based solely on facts proven beyond a reasonable doubt, I sentenced both Mr. Gray and Mr. Askew to 97 months of incarceration, followed by 3 years of supervised release. In determining this sentence, I found that the application of the *Booker* decision and the advisory guideline system presented no *ex post facto* concerns as implicated by the Due Process clause. I also found that, although not required, an additional Guide-

line calculation based upon proof beyond a reasonable doubt helped inform the exercise of my discretion as I weighed the advice of the advisory Guideline range. Finally, I found that while the holding of *Crawford* does not apply generally at sentencings, the use of witness testimony and cross-examination to resolve factual disputes was helpful in this case and is encouraged in future sentencing proceedings.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and **DIRECTS** the Clerk to post this published opinion at *http://ww.wvsd.uscourts.gov.*