STATE OF NORTH CAROLINA v. DAVID FRANKLIN HURT

No. COA09-442

(Filed 16 November 2010)

**1. Constitutional Law— Confrontation Clause—non-capital sentencing—jury determination required to increase sentence**

The Confrontation Clause of the Sixth Amendment applies to all sentencing proceedings, both capital and non-capital, where a jury determines a fact that would increase the defendant's sentence beyond the statutory maximum. *State v. Sings*, 182 N.C. App. 162, involved defendant's stipulation to aggravating factors and was limited to its facts.

**2. Constitutional Law— forensic analysts—summaries of reports of others**

The Confrontation Clause was violated where two SBI forensic analysts merely summarized the results of absent analysts.

Appeal by Defendant from judgment entered 4 April 2008 by Judge Thomas D. Haigwood in Caldwell County Superior Court. Heard in the Court of Appeals 1 October 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Robert C. Montgomery and Assistant Attorney General Daniel P. O'Brien, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Barbara S. Blackman, for Defendant.*

BEASLEY, Judge.

1

David Franklin Hurt (Defendant) appeals from judgment impos-
ing a sentence in the aggravated range for second-degree murder.
Specifically, Defendant challenges the sentencing jury's finding that,
as an aggravating factor, the offense to which he had pled guilty was
especially heinous, atrocious, or cruel. For the reasons stated below,
we hold Defendant is entitled to a new trial.

In 1999, Defendant was indicted for the first-degree murder of
Howard Nelson Cook and the first-degree burglary and common law
robbery perpetrated in the course thereof. Cook's nephew, William
Parlier, was also charged with Cook's murder. Parlier pled guilty to
first-degree murder and received a sentence of life in prison. After
Parlier reneged on his promise to testify against Defendant, the State
agreed to negotiate a plea with Defendant, and on 26 August 2002,
Defendant pled guilty to second-degree murder in exchange for dis-
missal of the remaining charges. The trial judge sentenced Defendant
to the maximum aggravated range of 276 to 341 months' imprison-
ment. Defendant appealed, and a divided panel held that the trial
court erred in treating "its finding that [D]efendant joined with one
other person" as an aggravating factor. *State v. Hurt*, 163 N.C. App.
429, 435, 594 S.E.2d 51, 55 (2004), *rev'd*, 359 N.C. 840, 616 S.E.2d 910
(2005), *and rev'd in part and aff'd in part as modified*, 361 N.C. 325,
643 S.E.2d 915 (2007). This Court vacated Defendant's sentence, and
remanded for resentencing. *See id.* at 434-35, 594 S.E.2d at 55-56 (rea-
soning that N.C. Gen. Stat. § 15A-1340.16(d)(2) provides for an aggra-
vated sentence when " '[t]he defendant joined with *more than one*
other person in committing the offense' " and remanding for a new
sentencing hearing because the trial judge imposed a sentence
beyond the presumptive term on the basis of an erroneous finding in
aggravation). On the State's direct appeal, our Supreme Court
reversed this Court's holding as to the aggravating factor issue
because "accomplishment of a robbery and murder by uniting with
one other individual" is a proper *nonstatutory* factor under N.C. Gen.
Stat. § 15A-1340.16(d)(20). *Hurt*, 359 N.C. 840, 844, 616 S.E.2d 910,
913 (2005), *vacated in part on other grounds*, 361 N.C. 325, 643
S.E.2d 915 (2007). Addressing Defendant's motion for appropriate
relief, however, the Court remanded for resentencing on different
grounds in accordance with *Blakely v. Washington*, 542 U.S. 296, 159
L. Ed. 2d 403 (2004), because his sentence exceeded the statutory
maximum but the upward durational departure from the presumptive
sentence was based solely on judicially found facts. *Hurt*, 359 N.C. at
845-46, 616 S.E.2d at 913-14. Issuance of the mandate was stayed, *Hurt*,
359 N.C. 846, 620 S.E.2d 528, and upon reconsideration, our Supreme

Court vacated its earlier opinion in part and remanded the case with instructions to remand to the trial court for a new sentencing hearing, *see Hurt*, 361 N.C. at 332, 643 S.E.2d at 919 (vacating the portion that remanded due to structural error and, instead, remanding "because the trial court's *Blakely* error was not harmless beyond a reasonable doubt," but leaving its aggravating factor analysis undisturbed).

During resentencing, a jury trial on aggravating factors was held at the 31 March 2008 Session of Superior Court in Caldwell County. At the outset of the trial, the court informed the jury panel that Defendant had previously entered a plea of guilty to the second-degree murder of Cook and that the State was now contending the existence of the aggravating factor that the offense pleaded to was especially heinous, atrocious, or cruel (HAC).[1]

On 26 February 1999, police found Cook dead in his home. Cook had sustained blunt force trauma and multiple stab wounds. Earlier that morning, Nancy and Jody Hannah were awakened when a man drove a white van into their backyard and got it stuck. Paula Calloway testified that Defendant and Parlier had previously come to her house in a white van. When she and Defendant awoke to Parlier leaving in the van, they went looking for it and found it stuck in a yard. Defendant freed the van, drove it back to Calloway's house, and fell asleep. Shortly thereafter, Calloway saw police lights and observed officers picking up Parlier in the road. Deputies Jason Beebee and Joel Fish with the Catawba County Sheriff's Office were responding to a call about a possible drunk driver and the van stuck in a yard when they saw an "extremely intoxicated" Parlier walking up the road and then falling into a ditch. Parlier had on his person four one-dollar bills, two of which had "reddish, brown stains on them." During their encounter with Parlier, the officers observed a white van in Calloway's driveway, which prompted them to return to her residence later that morning. Fish found Defendant in Calloway's bed and noticed that the white pants he was wearing had "darkening red spots" and a "brown stain" on them. Evidence collected from Calloway's bedroom included a pair of Defendant's boots and a sweatshirt lying near Defendant that Fish described as having "large reddish, brown stains on it." Another set of officers, also based on information gathered during the encounter with Parlier, went to

---

1. Although the State's notice to Defendant listed several non-statutory aggravating factors it intended to try before the resentencing jury, including Defendant's joining with one other person in the robbery and murder of Cook without being charged with committing conspiracy for the offenses, the State elected to proceed only on the HAC aggravator under N.C. Gen. Stat. § 15A-1340.16(d)(7).

check on Cook. Officer David Bates arrived at Cook's residence around 4:00 a.m. and found Cook laying on the floor in a large amount of blood. Paramedics and EMS personnel testified to the gross amount of blood at the scene and gaping wounds on Cook's body.

Special Agent Susie Barker, expert forensic biologist and serologist with the State Bureau of Investigation (SBI), testified that her section received a series of physical items in this case. The evidence was assigned to Special Agent Todd, who tested the items for the presence of blood and other bodily fluids and prepared a lab report detailing his results. Barker testified, over objection, that Todd had identified blood on Defendant's sweatshirt and boots and on a cigarette butt found outside Cook's front door. David Freeman, a special agent in the DNA unit of the SBI, then testified that former SBI Special Agent D.J. Spittle performed DNA testing on several items received from the serologist division. Over Defendant's objection, Freeman testified to the results of Spittle's analysis, including his conclusion that DNA found on Defendant's sweatshirt and boots matched Cook's DNA profile. Freeman also testified that the saliva-end of the cigarette found at the crime scene matched Defendant's DNA.

Dr. Patrick Lantz, a forensic pathologist and the Forsyth County Medical Examiner, testified in regards to Cook's autopsy report, completed by former forensic pathologist Dr. David Winston. Lantz testified, over objection by defense counsel, that Cook's "final autopsy diagnosis included sharp force injuries or stab wounds of the head and the neck, the thorax, the abdomen, the back, some blunt trauma to the head, neck[,] chest, abdomen, and some incised wounds." He continued that "[a]ccording to Dr. Winston's report he listed twelve major stab wounds involving the neck, the chest, the abdomen, and the back." Over objection, Lantz recited Winston's findings as to each of the stab wounds and testified to his opinion as a pathologist that six of the major stab wounds noted in the autopsy hit vital organs and could have been fatal in and of themselves. Lantz indicated that "[t]he stab wounds would have caused bleeding inside and outside of [Cook's] body" and would have been painful. However, because the stab wounds did not hit a major blood vessel or "any vital organs that would have caused immediate loss of consciousness," Lantz testified that it might have taken five to ten minutes before Cook went unconscious due to the blood loss. An additional five to ten minutes could have transpired after Cook lost consciousness before the time he died.

At the conclusion of the State's evidence, Defendant made a motion to dismiss the jury's consideration of the aggravating factor

that this offense was especially heinous, atrocious, or cruel. The trial court denied this motion, and Defendant did not present any evidence at this stage. The jury found, beyond a reasonable doubt, the existence of the aggravating factor that the offense was especially heinous, atrocious, or cruel.

During the mitigation phase, Defendant offered a "mitigation report" that had been compiled for his 2002 plea bargain proceedings, but the trial court sustained the State's hearsay objection and refused to admit the notebook. The defense first called Parlier, who admitted to currently being in custody for a conviction on his plea to first-degree murder but denied killing Cook and said it was Defendant who had done so. Defense counsel then attempted to impeach Parlier's testimony by asking about an affidavit he had previously signed. The affidavit stated that on the night of 25 February 1999, Parlier told Defendant that he needed a ride to Cook's house to borrow twenty dollars from his uncle; that Defendant waited outside in his van while Parlier went inside; that it was Parlier who stabbed Cook and thereafter directed Defendant to drive to the Rhodhiss Dam to dispose of evidence. Parlier, however, testified that the affidavit was false and, on cross-examination, explained that Defendant paid him forty dollars to copy and sign the affidavit. Defendant testified at the mitigation phase, and his recitation of the facts mirrored those that appeared in Parlier's affidavit, with additional details. Evidence was also heard from an inmate Parlier had approached for help in preparing his testimony for this case and from Defendant's aunt and uncle. The State then presented victim impact evidence.

Defense counsel requested a mitigated range sentence because Defendant played a minor role and read a portion of the 2002 plea hearing transcript wherein the prosecutor opined "Parlier [was] the actual killer." Despite defense counsel's argument that the State showed only that Defendant brought Parlier to Cook's house, was at the front door, and helped dispose of evidence, the trial court rejected the proposal that Defendant was a passive participant and declined to find any non-statutory mitigating factors. The trial court found that the HAC factor outweighed the factors in mitigation and that an aggravated sentence was thus justified. The trial court imposed a sentence in the maximum aggravated range, 276 to 341 months, from which Defendant appeals.

Defendant raises five arguments on appeal, specifically that the trial court erred in (1) denying his motion to dismiss due to the State's failure to establish that the offense was heinous, atrocious, or cruel;

(2) granting the State's motion to quash a subpoena for the appearance of Assistant District Attorney Jason Parker, as it deprived Defendant of the opportunity to elicit the State's "judicial admissions" made during guilty plea proceedings; (3) "permitting SBI Agent Freeman to testify that he is able to state whether a person committed the charged crime based upon whether a DNA match is made"; (4) refusing to admit Defendant's "mitigation report" on hearsay grounds at the mitigation phase; and (5) admitting hearsay evidence regarding blood tests, DNA analyses, and autopsy findings performed by non-testifying witnesses in the absence of a showing by the State that the non-testifying witnesses were unavailable, thereby depriving Defendant of confrontation and cross-examination rights. Because we conclude that the admission of certain forensic evidence violated Defendant's constitutional rights and was not harmless, we hold the trial court committed reversible error—rendering our review of Defendant's remaining contentions unnecessary—and address only his final argument.

I.

[1] Whether a defendant has a right to confront witnesses against him at sentencing trials conducted pursuant to *Blakely* is an issue of first impression in our courts. Defendant contends that United States Supreme Court decisions *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004), and, by extension, *Melendez-Diaz v. Massachusetts*, 557 U.S. ——, 174 L. Ed. 2d 314 (2009), should apply at all sentencing proceedings, whether capital or non-capital, that are held before a jury. For the reasons discussed herein, we agree that the Confrontation Clause of the Sixth Amendment applies to all sentencing proceedings where a jury makes the determination of a fact or facts that, if found, increase the defendant's sentence beyond the statutory maximum. Thus, because the trial court's admission of testimonial hearsay evidence during the aggravation phase of Defendant's sentencing proceedings violated the Confrontation Clauses of the federal and state constitutions and the constitutional errors were not harmless beyond a reasonable doubt, we remand this case for a new sentencing hearing.

A.

Whether a defendant's constitutional right to confrontation has been violated is a question of law which we review *de novo. See State v. Thorne*, 173 N.C. App. 393, 396, 618 S.E.2d 790, 793 (2005) ("It is well-settled that *de novo* review is ordinarily appropriate in cases where constitutional rights are implicated."). Generally, we interpret

**STATE v. HURT**

[208 N.C. App. 1 (2010)]

the Confrontation Clause of the North Carolina Constitution identically to its federal counterpart; thus, our analysis under each tends to be uniform, and, although Defendant's brief cites both provisions, we consider the federal version only in addressing his arguments. *See State v. Sings*, 182 N.C. App. 162, 164 n.2, 641 S.E.2d 370, 371 n.2 (2007) (noting the "general rule" that our courts construe the two confrontation clauses—Article I, § 23, and the Sixth Amendment of the state and federal constitutions, respectively—"as having no significant differences"); *see also infra* note 2.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The United States Supreme Court, however, has never explicitly ruled whether the Confrontation Clause applies at sentencing. *See, e.g., United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding."); *United States v. Kikumura*, 918 F.2d 1084, 1103 n.19 (3d Cir. 1990) (expressing "hope . . . that the Supreme Court in the near future will decide whether confrontation clause principles are applicable at sentencing hearings"); *United States v. Gray*, 362 F. Supp. 2d 714, 725 (S.D. W. Va. 2005) ("The Supreme Court . . . has never decided whether sentencings are 'criminal prosecutions' for Sixth Amendment purposes."). Despite the lack of any clear directive from the Supreme Court, the prevailing view among federal circuit courts and several state courts is that the constitutional right to confrontation does not apply at sentencing. *See, e.g., United States v. Paull*, 551 F.3d 516, 527 (6th Cir. 2009) ("While recent developments in sentencing and Confrontation Clause jurisprudence 'may be a broad signal of the future, there is nothing specific in *Blakely*, *Booker* or *Crawford* that would cause this Court to reverse its long-settled rule of law that [the] Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings,' and so we will 'continue to observe [our] precedent that testimonial hearsay does not affect a defendant's right to confrontation at sentencing.' "); *Rodgers v. State*, 948 So. 2d 655, 674-75 (Fla. 2006) (Cantero, J., concurring) (collecting recent federal appellate cases denying Confrontation Clause rights at sentencing); Michael S. Pardo, *Confrontation Clause Implications of Constitutional Sentencing Options*, 18 Fed. Sent'g Rep. 230, 230 (2006) ("Although the Supreme Court has not answered definitively whether a confrontation right ever applies at sentencing, several federal circuits have concluded that it does not.").

Still, the issue is far from settled. *See* Wayne R. LaFave et al., *Criminal Procedure* § 26.4(f), at 768 (3d ed. 2007) ("[A]lthough the federal courts of appeals unanimously declined to recognize a federal defendant's right to confrontation under either the Sixth Amendment or the Due Process Clause in the guidelines setting, several of these decisions have been divided . . . ."). Where the judiciary has grappled with the issue in both the capital and non-capital context, the scholastic writing has focused in large part on the extension of confrontation rights to capital sentencing. *See generally, e.g.,* Penny J. White, *"He Said," "She Said," and Issues of Life and Death: The Right to Confrontation at Capital Sentencing Proceedings,* 19 Regent U. L. Rev. 387 (2007). And while one court observed that *"Crawford v. Washington* . . . has breathed new life into the debate," *Gray,* 362 F. Supp. 2d at 725, the Supreme Court of North Carolina had already applied the right of confrontation to the sentencing phase of capital trials prior to *Crawford. See State v. Nobles,* 357 N.C. 433, 441, 584 S.E.2d 765, 771 (2003) ("[O]nce the state decides to present the testimony of a witness to a capital sentencing jury, the Confrontation Clause requires the state to undertake good-faith efforts to secure the 'better evidence' of live testimony before resorting to the 'weaker substitute' of former testimony."); *State v. Holmes,* 355 N.C. 719, 733, 565 S.E.2d 154, 165 (2002) ("While the Rules of Evidence do not apply to a capital sentencing proceeding, the constitutional right to confront witnesses does apply."). Thus, our courts have already resolved, without noting any controversy regarding the issue, the question of the Confrontation Clause's applicability at capital sentencing, with which many courts have struggled prior to *Crawford, see, e.g., Proffitt v. Wainwright,* 685 F.2d 1227, 1254 (11th Cir. 1982) (holding "the right to cross-examine adverse witnesses applies to capital sentencing hearings"); *Rodriguez v. State,* 753 So. 2d 29, 43 (Fla. 2000) (stating the "uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial"), or in light of *Crawford, see, e.g., United States v. Mills,* 446 F. Supp. 2d 1115, 1135 (C.D. Cal. 2006) (holding the protections of *Crawford* "apply to any proof of any aggravating factor during the penalty phase of a capital proceeding").

*Crawford* did, however, cast doubt on our jurisprudence in this area where our reasoning was based on the interconnection between confrontation rights and the rules of evidence. After the landmark ruling in *Crawford,* which is further detailed below, our Supreme Court applied the Confrontation Clause and the standard outlined by *Crawford* to capital sentencing testimony in *State v. Bell,* 359 N.C. 1,

34-36; 603 S.E.2d 93, 115-16 (2004). This Court recently declined to extend *Bell's* ruling to a non-capital sentencing hearing in *State v. Sings*, upon which the State now relies. *See Sings*, 182 N.C. App. at 165, 641 S.E.2d at 372 (noting that *Bell's* language requiring compliance with *Crawford* when the State presents testimonial evidence "to a *capital sentencing jury*" suggests the ruling is "intended to apply only to *capital* sentencing hearings"). The State contends that *Sings* is dispositive of the issue that *Crawford* does not apply in the non-capital sentencing context and forecloses Defendant's argument. However, where the sentencing in *Sings* was based on the defendant's stipulation to three aggravating factors and not pursuant to a *Blakely* hearing, *see id.* at 163, 641 S.E.2d at 371, our holding there cannot be read to encompass the facts of this case, where the factor potentially augmenting Defendant's sentence was determined by a jury. Because such stipulations dispensed with the necessity of impaneling a sentencing jury to find aggravating factors, we agree with Defendant that *Sings* "does not bear on the resolution of this issue." Rather, we hold today that *Crawford* does indeed apply to evidence offered to prove sentencing facts in the *Blakely* context, and the rationale therefor mirrors the justification for securing the right to confrontation in the capital sentencing context. An overview of the evolution in Confrontation Clause jurisprudence and its interplay with the United States Supreme Court's sentencing decisions will illuminate the bases for our conclusion. *See generally*, Nigel Hugh Holder, Comment, *Confrontation at Sentencing: The Logical Connection Between* Crawford *and* Blakely, 49 How. L.J. 179 (2005) (arguing that because of the changes *Crawford* and *Blakely* made to the landscape of the Sixth Amendment, the Confrontation Clause should apply at sentencing and therefore bar the use of testimonial hearsay during sentencing proceedings).

In overruling *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980), *Crawford* extricated the constitutional mandate of the right to confrontation from the rules of evidence by "reunit[ing] Confrontation Clause protection with the historical motivation for the clause." *Gray*, 362 F. Supp. 2d at 725; *see also Crawford*, 541 U.S. at 60, 158 L. Ed. 2d at 198 (discrediting the rationale of *Roberts* for its failure to be "faithful to the original meaning of the Confrontation Clause" and criticizing its departure from historical principles). Where the *Roberts* test conditioned admissibility of out-of-court statements on: (1) unavailability of the declarant and (2) reliability based on either a "firmly rooted hearsay exception" or, if none qualified, "particularized guarantees of trustworthiness," *Roberts*, 448 U.S. at 66, 65 L. Ed.

2d at 608, *Crawford* dispensed with the vague "reliability" criterion in favor of applying the Confrontation Clause to only a subset of hearsay statements: those which are "testimonial," *see generally Crawford*, 541 U.S. 36, 158 L. Ed. 2d 177. The new rule provided that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69, 158 L. Ed. 2d at 203.

The Court's sentencing decisions have evolved from *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000), a non-capital case holding "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455; to *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556 (2002), holding aggravating circumstances in capital cases function as elements and must be found by jurors, not judges; and, most recently to *Blakely*, 542 U.S. 296, 159 L. Ed. 2d 403, and *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621 (2005), extending *Apprendi's* rule to sentencing guidelines that supply fixed ranges, within the statutory maximum, based on additional findings of fact and explaining that the relevant statutory maximum is the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant. "All these cases stand for the proposition that any additional findings that increase a defendant's sentence beyond what state or federal law authorizes based solely on the jury's verdict are, in effect, 'elements' that must be submitted to a jury and proven beyond a reasonable doubt." Pardo, *supra*, at 231.

The North Carolina courts have addressed the scope of confrontation at sentencing but have not elaborated thereon in detail since *Blakely*. In *State v. Phillips*, 325 N.C. 222, 381 S.E.2d 325 (1989), our Supreme Court relied on *Williams v. New York*, 337 U.S. 241, 93 L. Ed. 1337 (1949), for the proposition that "[t]he use of hearsay evidence at sentencing hearings does not violate the Constitution of the United States." *Phillips*, 325 N.C. at 224, 381 S.E.2d at 326. In *Williams*, the United States Supreme Court addressed a capital defendant's due process challenge to an out-of-court presentence investigation report and concluded that due process did not limit the information available to sentencing judges, who were afforded broad discretionary power to fashion individualized sentences. *See Williams*, 337 U.S. at 242-45, 93 L. Ed. at 1339-41. Based on the emerging philosophy of the time—a rehabilitative model of punishment,

individualizing sentences under an indeterminate scheme—the Court noted that the wide latitude of discretion given judges "made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial," *id.* at 247, 93 L. Ed. at 1342, and recognized that most of the information relied upon by judges at sentencing "would be unavailable if . . . restricted to that given in open court by witnesses subject to cross-examination," *id.* at 250, 93 L. Ed. at 1343. Notwithstanding the retained validity of *Williams*, "some writers have argued that the combination of *Crawford* and *Blakely v. Washington*, which gave defendant a right to jury trial on facts that must be proved to enhance a sentence, should extend the right of confrontation to sentencing trials." 30A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 6371.2, at 84 (Supp. 2010) (footnotes omitted); *see also* LaFave et al., *supra*, § 26.4(f), at 767-68 ("Nevertheless, whether a defendant has a right to confrontation at sentencing has proved to be a controversial question in modern sentencing systems that, unlike the discretionary sentencing examined in *Williams*, clearly tie the severity of a sentence to particular findings of fact[,]" and " '[t]o rely on a decision made in a different world 40 years ago as the measure of due process, is to ignore the realities of the present system.' ").

One such scholar, noting that *Williams* by no means settled the "confrontation question," emphasizes the critical mistake of the courts' reliance on their pre-*Booker* or pre-*Blakely* cases and argues that such precedent "fails to seriously engage the text of the Sixth Amendment" and "is based on an erroneous understanding of the Confrontation Clause . . . [and] on now-rejected sentencing policy." Benjamin C. McMurray, *Challenging Untested Facts at Sentencing: The Applicability of* Crawford *at Sentencing After* Booker, 37 McGeorge L. Rev. 589, 605 (2006). As an example of the courts' misplaced dependence on *Williams*, he criticizes the 10th Circuit's analysis in *United States v. Beaulieu*, 893 F.2d 1177 (10th Cir. 1990):

> There the court stated, "[t]he Supreme Court has made clear that the constitutional requirements mandated in a criminal trial as to confrontation and cross-examination do not apply at non-capital sentencing proceedings." Reading this statement, we would expect the cited authorities to point us to some Supreme Court exposition of the significance of the Sixth Amendment, but as noted above, the Supreme Court has never addressed this issue. The cited authority is simply another Tenth Circuit case, which in

turn relied on *Williams* for the proposition that "[i]t seems clear from these decisions that the requirements mandated in a criminal trial as to confrontation and cross-examination are not applicable at sentencing proceedings. The right to confrontation is basically a trial right." But *Williams* said nothing about the Confrontation Clause. By reading earlier authorities as if they had resolved this constitutional issue, the pre-*Booker* courts have perpetuated the critical failure. Because no court has grappled with the meaning of the Sixth Amendment, circuit courts should welcome the opportunity to resolve this issue in the wake of *Crawford* and *Booker.*

*Id.* at 607-08 (footnotes omitted). Another scholar has noted that the refusal to extend the Confrontation Clause to sentencing based on *Williams* rests on two flawed assumptions: "First, trial and sentencing are different procedures that raise fundamentally different types of evidentiary demands and requirements. And second, the confrontation right is just a constitutionally required hearsay rule and thus no different from other evidence rules, which typically do not apply at sentencing." Pardo, *supra,* at 230 (footnote omitted). Professor Pardo continues: "The Court's recent sentencing decisions, from *Apprendi* to *Booker,* have vitiated the first assumption, and *Crawford* has explicitly rejected the second." *Id.* Where *Apprendi* eradicated the import of labels that attempt to distinguish " 'elements,' " required to be proven to a jury beyond a reasonable doubt, from " 'sentencing factors,' " and emphasized that "the relevant inquiry is one not of form, but of [the] effect" of the factual finding on punishment, *Apprendi,* 530 U.S. at 494, 147 L. Ed. 2d at 457, *Blakely* and *Booker* extended the reasonable doubt requirement to sentencing guidelines that impose fixed ranges within the statutory maximum. As such, the combination of *Apprendi* with *Booker* and *Blakely* has eroded any notion of a clear line separating trial from sentencing and distinguishing the procedural rights that must be afforded defendants at each phase. In *Crawford,* the Court rebuffed the notion that protection of the Confrontation Clause of the Sixth Amendment was intended to be left "to the vagaries of the rules of evidence," thus rejecting the antiquated premise that the Confrontation Clause is just a constitutional ban on hearsay, inextricably tied to evidentiary rules. *Crawford,* 541 U.S. at 61, 158 L. Ed. 2d at 199; *see also United States v. Fields,* 483 F.3d 313, 365 (5th Cir. 2007) (Benavides, J., dissenting) ("The Confrontation Clause and the rules of evidence offer entirely separate protections. Conforming to evidentiary rules regarding hearsay will not

satisfy the Confrontation Clause[;] . . . if a hearsay statement is not testimonial, the Confrontation Clause offers no protection.").

While some courts have clung steadfastly to *Williams* in post-*Crawford* cases, our Supreme Court has not demanded continued adherence to its tenets where the proceedings are so different in nature. In fact, no North Carolina appellate court has cited to *Williams* after *Crawford*. Thus, we are not bound to apply *Williams* to a context as distinct as *Blakely* sentencing hearings. Furthermore, many courts declining to extend confrontation rights to non-capital sentencing have overlooked the United States Supreme Court's decision in *Specht v. Patterson*, 386 U.S. 605, 18 L. Ed. 2d 326 (1967), another due process case that extended confrontation rights to the enhancement stage of sentencing for a sex offense. Where a state statute provided that, upon conviction, a sex offender was subject to an additional sentence if the judge found that the defendant constituted a threat of bodily harm or was a habitual offender and mentally ill, *Specht*, 386 U.S. at 607, 18 L. Ed. 2d at 329, the Court held that because the statute required "the making of a new charge leading to criminal punishment," the defendant must "have an opportunity to . . . be confronted with witnesses against him, [and] have the right to cross-examine," *id.* at 610, 18 L. Ed. 2d at 330. One court summarized the Supreme Court's ruling in *Specht*

> that the Constitution extends certain trial rights—including the right to confrontation—to *some* proceedings where a factfinder finds facts that necessarily subject a criminal defendant to additional liability. Although *Specht* did not explicitly mention the Sixth Amendment, the Court held that "[d]ue process . . . requires that [the defendant] be present with counsel, have an opportunity to be heard, *be confronted with witnesses against him, have the right to cross-examine,* and to offer evidence of his own." Therefore, once the activity of a sentencer stops being an exercise of discretion and becomes constitutionally significant factfinding, the right to confrontation attaches.

*Mills*, 446 F. Supp. at 1125 (internal citation omitted). Importantly, *Specht* involved the non-capital sentencing context and explicitly distinguished itself from *Williams* because the sentence imposed upon conviction was not within the judge's discretion but, rather, further findings were necessary for any enhancement thereof. *See id.* at 608, 18 L. Ed. 2d at 329 (noting the Court's continued adherence to *Williams* but "declin[ing] the invitation to extend it to this *radically different situation*" (emphasis added)).

Moreover, a large percentage of the cases that have declined to apply the Confrontation Clause to non-capital sentencing proceedings post-*Blakely* (or, more relevantly, post-*Booker*) were reported from federal jurisdictions. *See, e.g., Paull,* 551 F.3d at 527-28 (holding testimonial hearsay does not affect defendant's right to confrontation at sentencing but doing so under advisory guidelines system where *Blakely* and *Booker* did not require factual findings that increase sentence to be found by a jury beyond a reasonable doubt); *United States v. Bustamante,* 454 F.3d 1200, 1202-03 (10th Cir. 2006) (deeming the Confrontation Clause inapplicable at non-capital sentencing but *Booker* was not triggered because of advisory guidelines); *United States v. Cantellano,* 430 F.3d 1142 (11th Cir. 2005) (holding *Crawford* inapplicable at non-capital sentencing because the " 'right to confrontation is a *trial* right,' " but neither *Blakely* nor *Booker* applied and sentence was enhanced based on judicially found fact of prior conviction); *Mills,* 446 F. Supp. 2d at 1124 (noting the 9th Circuit's "holding that the hearsay-limiting rights afforded by the Confrontation Clause do not apply to *non-capital sentencing,* where the judge, *not the jury,*" makes the aggravating factor sentencing determination (second emphasis added)). In these cases, "[a]rguments that sentencings under the [federal] Guidelines closely simulate trials so as to require the same procedural protections have been significantly undermined by the *Booker* remedy that makes [those] Guidelines advisory." *Gray,* 362 F. Supp. 2d at 725.

Thus, a review of the caselaw negating that *Crawford* plays a role in sentencing proceedings after *Blakely* and *Booker* is a bit misleading because this view is held largely by *Booker* sentencing regimes, where the question becomes more difficult because the judge is not bound by the guideline calculation. *See id.* ("Under the advisory [Guideline] system, the factual findings that [judges] make at sentencing no longer mandate a defendant's punishment with mathematical precision. In the absence of such mandatory, fact-driven penalty determinations, arguments for constitutional procedural protections at sentencing are weakened."). Our Supreme Court, however, has held that, under the North Carolina sentencing system, any factor that authorizes an upward durational departure from the statutory maximum must be found pursuant to *Blakely. See State v. Blackwell,* 361 N.C. 41, 45, 638 S.E.2d 452, 455 (2006) ("[A]fter *Blakely,* trial judges may not enhance criminal sentences beyond the statutory maximum absent a jury finding of the alleged aggravating factors beyond a reasonable doubt."). Where sentencing facts are thus nec-

STATE v. HURT

[208 N.C. App. 1 (2010)]

essary in our state system to enable a judge to impose a sentence that exceeds the presumptive range for the convicted offense, such facts are the functional equivalent of elements of the underlying crime pursuant to *Apprendi* and *Blakely* under the federal constitution.[2] For, if aggravating factors warrant treatment as elements for due process purposes—in that a defendant is entitled to have a jury find them beyond a reasonable doubt before being eligible for an aggravated sentence—the logical corollary is that the same Confrontation Clause protections that are guaranteed at the guilt-innocence phase of trial also apply to evidence presented at a sentencing hearing to prove these factors. One state court has expressly agreed, and the facts are analogous to the instant case.

In *State v. Rodriguez*, 754 N.W.2d 672 (Minn. 2008), the Supreme Court of Minnesota held "that the right of confrontation applies in jury sentencing trials" because "if the Sixth Amendment right to a jury trial applies in jury sentencing trials, then the right of cross-examination, which is a core component of the jury trial right, applies in jury sentencing trials." *Rodriguez*, 754 N.W.2d at 681. The Minnesota court reasoned that the United States Supreme Court "turned to the historical understanding of the Sixth Amendment" in both *Apprendi* and *Blakely*, just as it did in *Crawford*, where the Court "quot[ed] Blackstone's observation that the open examination of witnesses . . . is much more conducive to the clearing up of truth." *Id.* at 679-80 (internal quotation marks and citations omitted).

2. To the extent that aggravating factors are not considered elements of a crime for purposes of Article I, § 23, of our state constitution, which grants "person[s] charged with crime . . . the right . . . to confront the accusers and witnesses with other testimony," N.C. Const. art. I, § 23, our reversal of this case is based on Defendant's federal Confrontation Clause rights, and a § 23 analysis would not change our conclusion. *Compare Blackwell*, 361 N.C. at 51-52, 638 S.E.2d at 459-60 (stating "aggravating factors are not, and have never been, elements of a 'crime' for purposes of Article I, Section 24 analysis"—requiring a unanimous jury verdict for any criminal conviction—and "declin[ing] to superimpose *Blakely's* definition of aggravator upon the well recognized definition of 'crime' under [§] 24"), *with Apprendi*, 530 U.S. at 494 n.19, 147 L. Ed. 2d at 457 n.19 (indicating that regardless of the term used, whether labeled "sentencing factor," "aggravating factor," or "sentence enhancement," if it "describe[s] an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict."), *and State v. Allen*, 359 N.C. 425, 460, 615 S.E.2d 256, 280 (2005) (Martin, J., concurring in part and dissenting in part) ("[T]he instant case deals with the failure to submit an *aggravating factor*, as opposed to an *essential element*, for jury determination. But this distinction provides no viable basis for distinguishing *Neder* [*v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35 (1999)], as the *Blakely* line of cases firmly establishes the principle that aggravating factors are the 'functional equivalent' of essential elements of the crime for purposes of the Sixth Amendment right to jury trial."), *withdrawn*, 360 N.C. 569, 635 S.E.2d 899 (2006).

*Rodriguez* also connected the Court's emphasis in *Apprendi* and *Blakely* on "the right to have a jury find the truth of every accusation beyond a reasonable doubt" to its emphasis in *Crawford* "that the Confrontation Clause requires that the reliability of testimonial statements be assessed by testing in the crucible of cross-examination." *Id.* at 680 (internal quotation marks omitted). Therefore, the Minnesota court rationalized that

> [t]he admission at a jury sentencing trial of testimonial statements of a witness who did not testify and who has not previously been subject to cross-examination surely constitutes the "use of *ex parte* examinations as evidence against the accused," which is "the principal evil at which the Confrontation Clause was directed."

*Id.* (quoting *Crawford*, 541 U.S. at 50, 158 L. Ed. 2d at 192). While it does not appear that another case emulating *Rodriguez* has been reported, several courts have expressed their approval of a rationale similar to that employed by the Minnesota court. *See Gray*, 362 F. Supp. 2d at 725 (proposing that "the truth-seeking function of the Confrontation Clause deserves attention at sentencing" because "[t]he adversarial system provides the best method of establishing the reliability of testimonial evidence and the appropriate weight to assign to such evidence," and, therefore, "strongly encourag[ing] the use of witness testimony and cross-examination to resolve factual disputes at sentencing, notwithstanding [the court's] finding that *Crawford* does not apply at sentencing under the post-*Booker* sentencing regime."); *In re M.P.*, 220 S.W.3d 99, 108 (Tex. App. 2007) (concluding that, "at a minimum," a criminal defendant should have confrontation rights at sentencing: "(1) in cases in which the State seeks imposition of a sentence on the basis of findings beyond those 'reflected in the jury verdict or admitted by the defendant'; and (2) whenever the State calls a witness to testify at punishment"); *see also* LaFave et al., *supra*, § 26.4(f), at 769 ("[S]entencing factors that qualify as elements, for which the defendant has a right to a jury determination and proof beyond a reasonable doubt, should be established by evidence that would meet the confrontation requirements for admission at trial."). We believe *Rodriguez* and the authorities sharing its rationale represent the better-reasoned view.

While we have never held that the right of confrontation applies to the sentencing phase of non-capital trials, no North Carolina case has addressed the similarities between the penalty phase of a capital case and jury sentencing hearing in a non-capital case under *Blakely*.

Both require the State to prove an element to a jury beyond a reasonable doubt, and without a finding of an aggravating factor by the trier of fact, the presumptive sentence is the maximum sentence that can be imposed for the crime. Where confrontation rights apply in one context, they should apply equally to the other. Our caselaw supports this conclusion by comparing sentencing proceedings to jury trials on several occasions, suggesting that any factual issue required to trigger a certain sentence is a "trial issue," whether arising during the guilt or sentencing phase of trial. *See, e.g., State v. Pinch,* 306 N.C. 1, 22, 292 S.E.2d 203, 221 (1982) (equating capital sentencing to a trial proceeding by noting that, "[a]s a general matter, the truthfulness of any aspect of any witness's testimony may be attacked on cross-examination" and explaining that "[t]his basic rule applies to all trial proceedings, including both the guilt and sentencing phases in capital cases"), *abrogated in part on other grounds by State v. Wilson,* 322 N.C. 117, 145, 367 S.E.2d 589, 605 (1988), *and overruled in part on other grounds by State v. Benson,* 323 N.C. 318, 326, 372 S.E.2d 517, 521 (1988), *and State v. Robinson,* 336 N.C. 78, 110, 443 S.E.2d 306, 321 (1994). Notably, our Supreme Court in *State v. Lopez,* 363 N.C. 535, 681 S.E.2d 271 (2009), a non-capital case conducted pursuant to *Blakely,* discussed the rules of procedure and evidence meant to assure the evidence a *sentencing* jury hears and considers is reliable by referring to N.C. Gen. Stat. § 7A-97, which deals with jury trials. *See Lopez,* 363 N.C. at 540-41, 681 S.E.2d at 275 (discussing the propriety of closing arguments made during a jury sentencing trial on aggravating factors with reference to "[t]he rules of procedure and evidence [which] are meant to assure that the evidence a jury hears and considers is reliable"); *see also id.* at 544, 681 S.E.2d at 277 (Brady, J., concurring in the result only) ("The jury was charged with answering one question: Did the evidence presented support the finding of the aggravating factor? This is purely a factual question, and *much like in the guilt-innocence phase of the trial,* the jury is asked to evaluate whether the State presented sufficient evidence to prove its case." (emphasis added)). Our Supreme Court has also stated in another non-capital case, long before *Crawford* and *Blakely,* albeit without further discussion, that "[a]lthough G.S. 15A-1334(b) makes inapplicable 'formal rules of evidence' at the sentencing hearing, the statute does require that defendant be given an opportunity to *confront and cross-examine witnesses against him* and to present witnesses and arguments in his own behalf." *State v. Williams,* 295 N.C. 655, 670, 249 S.E.2d 709, 720 (1978) (emphasis added), *superceded by statute on other grounds.*

While it has been said that "death is different," we perceive the importance of safeguarding the accuracy and propriety of jury fact-finding in sentencing clearly as pertaining to both the capital and non-capital context. *See United States v. Brown*, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006) (distinguishing the inapplicability of *Crawford* in the context of non-capital sentencing from the court's previous holding "that the constitutional right to cross-examine witnesses applies to capital sentencing hearings" on the basis that "death is different"). *But see Fields*, 483 F.3d at 367 (Benavides, J., dissenting) ("I agree that the Confrontation Clause typically will not apply at noncapital sentencing, *so long as* the sentencing facts apply to an indeterminate scheme and a judge has broad discretion in imposing the sentence. Only to that extent is *Williams's* application plain. But the Supreme Court recently recognized [in *Apprendi*] that even noncapital sentencing is not always so different from trial proceedings, and if the sentencing facts 'increase the prescribed range of penalties to which a criminal defendant is exposed' such that the sentencing fact is the 'equivalent of an element of a greater offense than the one covered by the jury's guilty verdict,' then the Confrontation Clause should apply and *Williams* does not control even in the noncapital context." (emphasis added)); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (citing *Specht* for the proposition that "the Confrontation Clause applies during those portions of a sentencing proceeding that can lead to an increase in the maximum lawful punishment"). For, it appears that, in a system such as ours where confrontation rights are already embedded in the capital sentencing scheme, the better approach compares the nature of those proceedings (along with the guilt-innocent phase), rather than the nature of the punishment, as *Apprendi*, a non-capital case, intimates:

> If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.

*Apprendi*, 530 U.S. at 484, 147 L. Ed. 2d at 451. Without minimizing the unrivaled severity of capital punishment, we simply acknowledge that in both capital and non-capital jury sentencing, the defendant endures another "mini-trial," which has often been bifurcated or even trifurcated from the trial on the substantive offense, to discover

whether he will lose more liberty than otherwise allowable under the applicable statute. *See* John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L. Rev. 1967, 1967, 1973 (2005) ("[d]rawing on the history of unified trials in the era of the Framers," who "knew nothing of a 'guilt' phase and a 'penalty' phase," and noting that the Sixth Amendment hails from a time where guilt and sentencing "were determined simultaneously by a single jury verdict in a trial with full adversarial rights," in support of his argument that the later-evolved practice of bifurcating trial from sentencing, cannot be viewed as an indication "that the 'trial rights' of the Sixth Amendment were conceived with such a separation in mind"). Thus, we believe that in determining the availability of constitutional *procedural* protections in specific contexts, the proper focus is on the essential characteristics of the *procedure* at issue and not on the incommensurate punitive measures different defendants may face at those otherwise similar stages. Accordingly, we distinguish the procedural aspects of *Sings*, where sentencing proceeded after the defendant *stipulated* to the aggravating factors at issue, and limit our holding there to the facts of that case. *See Sings*, 182 N.C. App. at 163, 641 S.E.2d at 371. Where, however, the sentencing fact to be proved is covered by *Blakely*, such that it must be found beyond a reasonable doubt before a judge may impose a sentence above that allowed by the presumptive range, *Crawford* applies.

Our holding is consistent with the syllogism illustrated by Professor Pardo: (1) additional findings that are required to increase a defendant's sentence are "elements," and, as such, "despite their labels and when they occur," these "issues at 'sentencing' function as as-yet-undecided 'trial' issues"; (2) the Confrontation Clause applies to trial issues; and (3) "the confrontation right should apply to sentencing issues that function as 'elements' or trial issues" just like those adjudicated at trial Pardo, *supra*, at 231.[3]

B.

[2] Having determined that the Confrontation Clause applies during non-capital jury sentencing trials, we must determine if Defendant's rights thereunder were violated and, if so, whether such error was

---

3. We note that our holding has no effect on the established inapplicability of other evidence rules at sentencing, nor do we hold or suggest that they should apply. Our evidence rules are matters of legislative discretion; thus, "it is not inconsistent to conclude that the Confrontation Clause should apply at sentencing because it is a constitutionally mandated requirement, while other evidence rules (such as those involving hearsay, character, and impeachment) may not apply." Pardo, *supra*, at 231.

STATE v. HURT

[208 N.C. App. 1 (2010)]

harmless. We conclude that *Melendez-Diaz*, an extension of *Crawford* in Confrontation Clause jurisprudence, prohibited the introduction of the results of the non-testifying forensic analysts, and the trial court's error in allowing the substitute witnesses to testify was not harmless.[4]

"The Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant." *State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293, 304 (2009) (citing *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203). Our analysis of whether Defendant's confrontation rights were violated consists of a three-part inquiry implemented pursuant to *Crawford*, and we must determine: "(1) whether the evidence admitted was testimonial in nature; (2) whether the trial court properly ruled the declarant was unavailable; and (3) whether defendant had an opportunity to cross-examine the declarant." *State v. Clark*, 165 N.C. App. 279, 283, 598 S.E.2d 213, 217 (2004). While *Crawford* did not explicitly define "testimonial" evidence, leaving the lower courts to shape the term's parameters, *see Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' "), the United States Supreme Court did provide various examples of the types of statements that are testimonial in nature, including:

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52, 158 L. Ed. 2d at 193 (internal quotation marks, citations, and alteration omitted).

---

4. While *Melendez-Diaz* was decided over one year after Defendant's resentencing trial was finalized, the Supreme Court's reasoning is applicable to the instant case. *See United States v. Johnson*, 457 U.S. 537, 549, 73 L. Ed. 2d 202, 213 (1982) ("[W]hen a decision of [the Supreme] Court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively. In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way.").

Further illustrating the Sixth Amendment's prohibition against the prosecution's attempt "to prove its case via *ex parte* out-of-court affidavits," the United States Supreme Court recently applied the *Crawford* holding to documents or reports that the government seeks to enter into evidence that are "testimonial" in nature. *Melendez-Diaz*, 557 U.S. at ——, 174 L. Ed. 2d at 332. In *Melendez-Diaz*, the Court addressed the admissibility of a sworn "certificate of analysis," displaying the results of forensic testing, as evidence that a seized substance was illegal contraband. *Id.* at ——, 174 L. Ed. 2d at 320. Reasoning that "[t]he 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" the Court had no doubt that these documents "fall within the 'core class of testimonial statements'" described in *Crawford. Id.* at ——, 174 L. Ed. 2d at 321. As such, "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." *Id.* at ——, 174 L. Ed. 2d at 322. "Thus, when the State seeks to introduce forensic analyses, '[a]bsent a showing that the analysts [are] unavailable to testify at trial *and* that [defendant] had a prior opportunity to cross-examine them' such evidence is inadmissible under *Crawford." Locklear*, 363 N.C. at 452, 681 S.E.2d at 305 (quoting *Melendez-Diaz*, 557 U.S. at ——, 174 L. Ed. 2d at 322). Stated alternatively, if it is not shown that an analyst is unavailable to testify at trial *and* that there was a prior opportunity for cross-examination available to the accused, *Melendez-Diaz* entitles the criminal defendant "to be confronted with the analysts at trial." *Melendez-Diaz*, 557 U.S. at ——, 174 L. Ed. 2d at 322 (internal quotation marks omitted).

The North Carolina Courts "have applied the reasoning of *Melendez-Diaz* to other types of witnesses and testimony" in a series of opinions based on that decision. *State v. Craven*, —— N.C. App. ——, ——, 696 S.E.2d 750, 752 (2010). In *Locklear*, our Supreme Court extended the *Melendez-Diaz* holding from its focus on the admissibility of documents themselves as an offer of forensic proof to likewise govern testimony of experts who essentially rely on such documents as the basis for their opinions. *See Locklear*, 363 N.C. at 452, 681 S.E.2d at 304-05 (applying *Melendez-Diaz* to proscribe in-court expert testimony as to the opinions rendered by other experts, where the State's witnesses merely recited the contents and findings contained within "testimonial" reports prepared by the non-testifying forensic examiners). There, it was error for the trial court to admit "evidence of forensic analyses performed by a forensic pathologist

and a forensic dentist who did not testify" because "[t]he State failed to show that either witness was unavailable to testify or that defendant had been given a prior opportunity to cross-examine them." *Id.* at 452, 681 S.E.2d at 305. However, "[w]ell-settled North Carolina case law allows an expert to testify to his or her own conclusions based on the testing of others in the field." *State v. Mobley,* 200 N.C. App. ——, ——, 684 S.E.2d 508, 511 (2009), *disc. review denied,* 363 N.C. 809, 692 S.E.2d 393 (2010); *see also State v. Hough,* —— N.C. App. ——, ——, 690 S.E.2d 285, 291 (2010) (declining to find *Melendez-Diaz* abrogates the cases "that relied on *Crawford* and were decided prior to *Melendez-Diaz* . . . where the analyst who testified asserted his or her own expert opinion"). Thus, when an "underlying report, which would be testimonial on its own, is used as a basis for the opinion of an expert who independently reviewed and confirmed the results," it is "not offered for the proof of the matter asserted" and does not implicate the Confrontation Clause. *Mobley,* 200 N.C. App. at ——, 684 S.E.2d at 512.

In *Mobley,* we distinguished the expert testimony at issue from the facts of *Locklear.* Where the medical examiner in *Locklear* "did not testify to his own expert opinion based upon the tests performed by other experts, nor did he testify to any review of the conclusions of the underlying reports or of any independent comparison performed," the testifying expert in *Mobley* "testified not just to the results of other experts' tests, but to her own technical review of these tests, her own expert opinion of the accuracy of the non-testifying experts' tests, and her own expert opinion based on a comparison of the original data." *Id.* at ——, 684 S.E.2d at 511. As such, the challenged testimony did not implicate the Confrontation Clause, and accordingly no violation of *Crawford* or *Melendez-Diaz* occurred. *See id.* at ——, 684 S.E.2d at 512. In *Hough,* this Court approved the admission of expert testimony as to the identity of controlled substances delivered by a witness who did not conduct or witness the underlying testing performed by a non-testifying forensic chemist. *See Hough,* —— N.C. App. at ——, 690 S.E.2d at 290-92 (holding that while the report at issue "formed the basis" of the expert's opinion, it "was not offered for the proof of the matter asserted and was not prima facie evidence that the substances recovered from the crime scene were, in fact, marijuana and cocaine"). The witness had described in great detail that which her "peer review" entailed, sufficiently showing that "her expert opinion was based on an independent review and confirmation of test results," but we emphasized,

notably, that "[i]t is not our position that every 'peer review' will suffice to establish that the testifying expert is testifying to his or her expert opinion." *Id.* at ——, 690 S.E.2d at 291.

Here, the prejudicial testimony from testifying experts summarizing another non-testifying expert's reports consisted of the serologist and DNA evidence offered by SBI Agents Barker and Freeman respectively.[5] Both lab reports were clearly testimonial under the tenets of *Melendez-Diaz. See Locklear*, 363 N.C. at 452, 681 S.E.2d at 305 ("The [Supreme] Court specifically referenced autopsy examinations as one such kind of forensic analyses [that qualify as testimonial statements]."); *Mobley*, 200 N.C. App. at ——, 684 S.E.2d at 511 ("Although the Court in *Melendez-Diaz* addressed only drug testing, the Court's analysis easily implicates DNA testing as well."). Still, the admissibility of Barker and Freeman's testimony will not be governed by the *Melendez-Diaz* if the reports upon which they relied merely provided a basis for their *independent* expert opinions but were offered neither as proof of the matter asserted nor *prima facie* evidence that the items linking Defendant to the crime contained blood or saliva that matched his DNA profile. We conclude, however, that the reports in the instant case were not limited to this permissible function. As discussed below, the testimony elicited from Barker and Freeman intended to reveal their level of participation in the forensic testing at issue or their independent familiarity with the results thereof falls short of that held to be sufficient in *Mobley* and *Hough*. Rather, the facts here more closely mirror those of *State v. Galindo*, —— N.C. App. ——, 683 S.E.2d 785 (2009). In *Galindo*, even though the expert chemist explained the lab's chain of custody protocol, which had been followed, and testified that the analytical procedures "exceeded industry standards" and were "relied upon by experts in the field of forensic chemistry," it was clear that his identification of certain

5. While the United States Supreme Court included autopsy examinations in its list of forensic analyses controlled by *Melendez-Diaz* and our courts have explicitly deemed autopsy reports to constitute testimonial evidence thereunder, *see Locklear*, 363 N.C. at 452, 681 S.E.2d at 305 (citing *Melendez-Diaz*, 557 U.S. at —— n.5, 174 L. Ed. 2d at 326 n.5), we do not discuss Lantz's testimony to the non-testifying pathologist's autopsy findings at great length. For, even if Lantz's recitation of stab wounds visually observed by Dr. Winston and listed in the latter's report are considered a type of testimonial forensic evidence contemplated by *Melendez-Diaz*, his description of Cook's stab wounds was not prejudicial. Several responding officers and EMS personnel also testified to the wounds they personally observed, and several photographs of the victim's body were published to the jury for inspection. Moreover, Lantz's opinion testimony regarding the impact of the various wounds and the time it would have taken for Cook to lose consciousness was clearly based, not on the report at all, but on his own independent experience as a pathologist.

chemical substances was "based 'solely' on the lab report" prepared by another non-testifying analyst. *Id.* at —, 683 S.E.2d at 787.

Neither expert in the case *sub judice* testified to having taken part in conducting any of the testing of the substance, nor did either perform any independent analysis. Special Agent Barker testified that the items sent to the serologist division were assigned to Special Agent Todd, who is no longer employed with the SBI. While Barker approved of the techniques and procedures employed by Todd, her testimony demonstrates that her familiarity with this case was limited to her role as "technical reviewer" of Todd's report. Barker stated that "[i]t's required for any report before it goes out that it have a peer review by someone who is certified in that area" and that she "actually did the peer review on this case." She found the procedures used by Todd to be in accordance with standard methods and concurred with his analyses and results, but there is absolutely no indication that Barker conducted any independent testing designed to confirm the conclusions of the non-testifying expert, made any comparison of the original data in formulating her opinion, or ever even inspected any item of physical evidence prior to testifying in this case. In fact, Barker's recognition of the evidence tested by Todd seems to have been limited to her ability to identify Todd's initials on each envelope containing the particular item and not on any personal examination thereof or confirmation of the results relating thereto. As the State presented each exhibit, Barker recited which tests Todd had performed thereon and what the results of those tests were. Only after eliciting testimony as to Todd's results did the State revisit each exhibit and ask Barker, based on her review of the tests and analyses performed, to provide her opinion as a forensic biologist of what bodily fluids each exhibit contained. Thus, Barker's initial testimony as to the results was clearly a mere recitation of the findings contained in Todd's lab report. Only later did Barker purport to offer her expert opinions, which conformed entirely to that which Todd's report indicated, without explanation of any review or confirmation she performed on any particular item. Barker's general testimony at the outset of her examination that she concurred with Todd's results is not sufficient to show that the opinions she offered were indeed her own.

Special Agent Freeman with the DNA unit likewise testified as the technical reviewer of non-testifying declarant Agent Spittle's work. While Freeman indicated that he was "very familiar with the testing that was used" because he "helped validate the system," his dealings with this particular case were limited to "the specific report

that [Spittle] generated and all the subsequent notes." Freeman also identified the State's exhibits solely through recognition of Todd and Spittle's initials. The only further explanation of Freeman's involvement with this case referenced his "review of the notes and the fact that [he was] the person that basically did the peer review." After identifying each exhibit, Freeman reported the results of the DNA testing performed thereon by Spittle and then offered his "opinion[s] as to the [DNA results] that [he] just testified to." This putative opinion testimony, however, mirrored the findings of Spittle's underlying report exactly. On cross-examination, Freeman further indicated that he had conducted no independent research to confirm the contents of the underlying report, when defense counsel asked, "Now, you tested other items as part of your analysis, DNA analysis, is that correct?" Freeman clarified that "[o]ther items were tested by Special Agent Spittle" and continued to testify specifically to *Spittle's* conclusions and what "[h]is results indicate." The State elicited no testimony that Freeman's "opinion as to [Spittle's] results," finding various DNA matches between Defendant and the evidence tested, was based on anything other than the witness's reading of the lab report.

The mere peer review of the retired agents' methods and conclusions does not suffice in this case, for the transcript reveals that these experts were merely summarizing the results of the absent analysts. Neither Barker nor Freeman provided any insight as to the nature or details of their peer review, and it is clear from their testimony that they took no part in conducting any testing or independent analyses of the evidence at issue. Accordingly, Barker and Freeman were not using the reports of another expert as the basis for their own independent expert opinions but, rather, were "merely reporting the results of other experts." *Mobley*, ⸺ N.C. App. at ⸺, 684 S.E.2d at 511. As such, the reports were clearly being utilized by the testifying experts as a vehicle through which they impermissibly offered the statements of other expert analysts for the truth of the matter asserted, implicating the Confrontation Clause.

This case is akin to *Locklear* because the challenged evidence— Barker and Freeman's testimony based solely on the lab reports of non-testifying analysts—was testimonial in nature and therefore was subject to the requirements of *Crawford* and *Melendez-Diaz*. Accordingly, it was constitutional error for the trial court to admit the serology and DNA reports as well as Barker and Freeman's testimony as to the contents thereof because there was no showing by the State regarding any prior opportunity for cross-examination by Defendant.

*Crawford* and *Melendez-Diaz* thus entitle Defendant to be confronted with the analysts at trial. Moreover, testimony that the original SBI analysts had retired does not suffice to establish that the State made "good-faith efforts" to procure their presence as witnesses at trial, *Nobles*, 357 N.C. at 441, 584 S.E.2d at 771, and does not constitute a showing of unavailability. Barker and Freeman should not have been allowed to testify to the presence of blood on the several items of evidence submitted to the SBI or to the follow-up DNA test results implicating Defendant because these opinions were based exclusively on the tests that Agents Todd and Spittle claimed to have performed and their unconfirmed observations. Furthermore, these errors were certainly not harmless. Where it was proper for the jury "to consider . . . [D]efendant's actual role in the offense as opposed to his legal liability for the acts of others," *State v. Benbow*, 309 N.C. 538, 546, 308 S.E.2d 647, 652 (1983), evidence of his participation and involvement in the crime was submitted only in the form of this forensic evidence that was improperly admitted under the Confrontation Clause. Accordingly, Defendant is awarded a new sentencing trial.

New trial.

Judges STEPHENS and HUNTER, Jr. concur.